## JOHN REEVES v. TERRITORY OF OKLAHOMA.

(Filed June 30, 1900.)

1. INDICTMENT FOR MURDER—*Burden of Proof on Defendant, When.* Where an indictment for murder contains an averment 'that Milton Jones was shot and killed by one of three escaping prisoners, but which one is to the grand jury unknown," and no evidence whatever upon the subject is offered by either the prosecution or the defendant, the verity of the averment of want of knowledge in the grand jury is presumed, and the burden is on the defendant to show that the grand jury at the time the indictment was found knew the name of the person described as unknown.

2. HOMICIDE—*Murder, When.* Homicide under the statutes of this Territory, is murder when perpetrated without any design to effect death by a person engaged in the commission of a felony.

3. FELONY, AIDING IN PRISONERS ESCAPE CONSTITUTES. Under the laws of this Territory it is a felony for any person who carries or sends into any prison anything useful to aid any prisoner in making his escape, and with intent thereby to facilitate the escape of any prisoner confined therein, where such prisoner is confined upon any charge or conviction of a felony.

4. CONSPIRACY—*Presumption Concerning.* Where several persons confederated together to commit a crime of a nature or under such circumstances as will when tested by human experience, probably result in the taking of human life if such necessity should arise to thwart them in the execution of their unlawful plans, it must be presumed that they all understood the consequences which might be resonably expected to flow from carrying into effect their unlawful combination, and to have assented to the taking of human life if necessary to accompl sh such unlawful act. And if death happens in the prosecution of such a common des gn or object, all are alike guilty of a homicide.

5. FELONY—*Persons Concerned in, Principals.* Under the laws of this Territory, all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, must be indic ted, tried and punished as principals.

6. INSTRUCTIONS TO JURY—*Law Correctly Stated.* The Court gave the jury the following instruct on over the objections of the defendant, and which is assigned as error: "You are further instructed that if you believe from the evidence in th's case beyond a reasonable doubt, that on and prior to the said 30th day of June, 1898, William Christian, Robert Christian and James Casey, named in this indictment were confined as prisoners in the common jail and prison of and in the county of Oklahoma and Territory of Oklahoma, the said William and Robert Christian upon an order and commitment upon and after the conviction of the crime of manslaughter, and the said James Casey up n a commitment and ind ctment charging h m the sa d James Casey with the crime of murder, then the said William Christian, Robert Christian and James Casey were lawfully imprisoned in said county jail and prison; and if you find from the evidence beyond a reasonable doubt that the defendant herein, John Reeves, did carry or place or cause to be carr ed or plac d or in any manner and or ass st in carrying or placing in the sa d jail and in the p sses ion of the said Will am Christian, Robert Chr stian and James Casey, any p stols, revolvers and ammunition with the design and intent that they the said William Christian, Robert Christian or James Casey or either of them, should use or employ such p stols, revolvers, ammunition or any of them, as a means and for the purpose of breaking out of said jail and prison and escaping therefrom; and if you further believe from the evidence beyond a reasonable doubt that the sa d William Christian, Robert Christian and James Casey, act ng conjointly and together and with a common purpose to secure the liberty from such imprisonment of each of said prisoners, did break out of sa d jail and attempt to escape therefrom and that they the said William Christian, Robert Christian and James Casey, or e ther of them, in breaking out of sa d jail, or in their immed ate fl ght therefrom, in escaping therefrom did with the said pistols and revolvers or any of them, shoot and kill the deceased, Milton Jones, in manner and

form as charged in this indictment and in furtherance of their said design and purpose to escape from such imprisonment, then you will find the defendant John Reeves guilty of murder as charged in the third count of this indictment, although the jury may believe from the evidence that the fatal shot which killed him the said Milton Jones was not fired and discharged with premeditated design to effect the death of him the said Milton Jones." *Held*, That no error was committen in giving this instruction, and that it clearly, fairly and correctly states the law applicable to the case under consideration.

7. EVIDENCE CONCLUSIVE—*Rule Applied.* We have carefully examined the entire record, and we are clearly of the opinion that the evidence fully sustains the verdict of the jury, and that there is no prejudicial error in the record.

(Syllabus by the Court.)

*Error from the District Court of Canadian County; before John C. Tarsney, District Judge*

*A. Green & Son,* for plaintiff in error.

*J. C. Strang, Attorney General,* for defendant in error.

Opinion of the court by

HAINER, J.:  The plaintiff in error, John Reeves, was indicted in the district court of Oklahoma county, charging him with the murder of one Milton Jones, on the 30th of June, 1895.  Upon application of the defendant a change of venue was granted to Canadian county, where the defendant was tried and convicted of murder, as charged in the third count of the indictment, and acquitted on the first and second counts thereof, and his punishment was fixed by the jury at imprisonment in the territorial penitentiary for life, at hard labor.  On the 15th day of February, 1897, the court sentenced the defendant in accordance with the verdict of the jury to imprisonment in the territorial prison at Lansing, Kansas, for the term of his natural life, at hard labor.

The third count of the indictment, upon which the defendant was convicted, reads as follows:

"That in Oklahoma county and Territory there was from the 10th day of June, 1895, until the 30th day of June, 1895, confined in the jail of Oklahoma county at Oklahoma City, Robert Christian and William Christian, Jr., on conviction for felony, to-wit: the crime of manslaughter, which conviction had been had in the district court of the third judicial district in the county of Pottawatomie in said territory; and one James Casey was confined in said jail during the same time as a prisoner on indictment for murder returned against him in the county of Canadian, second judicial district of said territory. That while said persons were so confined in said jail, defendants William Carr, John Reeves, Tellus Welch and Jesse Findley, together in conjunction with said prisoners and by agreement among themselves did furnish, send and carry into said jail three pistols commonly called revolvers, and ammunition for the same being useful to aid said prisoners in effecting their escape from said jail, with the intent on the part of all the defendants that said pistols and ammunition should be used by said prisoners in effecting their escape from said jail. That on the 30th day of June, 1895, said prisoners, their co-defendants not being present, did escape from said jail, and their escape and flight was then sought to be prevented by one Milton Jones who was then and there a peace officer, when one of the said prisoners so escaped but which one is to the grand jury unknown, did with one of the revolvers, in Oklahoma county and Territory of Oklahoma, on the 30th day of June, 1895, shoot and mortally wound the said Milton Jones, as a means of preventing him the said Milton Jones from arresting the escape of said prisoners; and of said shooting and mortal wounding so done the said Milton Jones then and there died. Thereby all of said defendants, while engaged in the commission of a felony and without any design to effect death, did in the manner and form aforesaid perpetrate the killing and murdering

of him, the said Milton Jones, contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the Territory of Oklahoma."

It is first contended by counsel for plaintiff in error that the allegation of the indictment, "that Milton Jones was shot and killed by one of three escaping prisoners, but which one is to the grand jury unknown," is a material averment of the indictment, and permitted from necessity, and that it must be proved by the prosecution in order to sustain a conviction. That if the grand jury by asking any witness before them, or the exercise of reasonable diligence, could have ascertained the fact, it is fatal, and the defendant must be discharged.

We do not think that this contention is sound or tenable. There was no evidence whatever offered either on behalf of the prosecution or the defendant that the person who shot and killed Milton Jones was known to the grand jury at the time of the finding of the indictment. We think that in the absence of any evidence upon that subject it is presumed that the grand jury had no such knowledge. We think that the better doctrine and true rule is that where there is an averment in the indictment that the person who committed the homicidal act is unknown to the grand jury, and no evidence is offered by either the prosecution or the defendant, the verity of the averment of want of knowledge in the grand jury is presumed, and the burden is upon the defendant to show that the grand jury at the time the indictment was found knew the name of the person described as unknown. This is the rule laid down by the supreme court of the United States in the case of *Coffin v. United States*, 156 U. S. 432. Mr. Justice White in discussing this subject said:

"There was no evidence whatever upon the subject offered by either side, and nothing to indicate that there was knowledge in the grand jurors of the matter which the indictment declared to be to them unknown. The instruction was rightly refused. It presupposes that where there is an averment that a person or matter is unknown to a grand jury, and no evidence upon the subject of such knowledge is offered by either side acquittal must follow, while the true rule is that where nothing appears to the contrary the verity of the averment of want of knowledge in the grand jury is presumed."

The same rule has been laid down by the supreme court of Massachussetts, in the case of *Commonwealth v. Thornton*, 14 Gray 41.

In *Guthrie v. State*, 16 Neb. 670, the following rule was announced by the supreme court of that state:

"While it is, perhaps, true at common law that if it was shown that this particular allegation was untrue, that the grand jury did know the parties whose names were omitted, then that an acquittal must follow. But it by no means follows that this allegation, like those which are met by the presumption of innocence, must be proved by the state beyond a reasonable doubt. Upon the contrary quite a different rule is to be applied, and the burden is on the defendant to show that the grand jury at the particular time of finding the indictment knew the names of the party described as unknown."

It is next urged by counsel for plaintiff in error that the evidence offered by the prosecution is wholly insufficient to sustain a verdict of guilty as charged in the third count of the indictment and that the court erred in overruling the demurrer interposed to the evidence after the prosecution had rested its case. We have carefully examined the entire record, and we are clearly of the opinion that the evidence is sufficient to uphold the verdict of the jury.

It was admitted on the trial of the cause that Robert Christian and William Christian were incarcerated in the Oklahoma county jail on conviction for manslaughter pending the time for giving bond and obtaining supersedeas. It was also admitted that James Casey was confined in said jail charged with the crime of murder. It further appears from the record that the defendant John Reeves and one John Fessenden and William Carr had formed and entered into a plan and common design whereby they were to liberate from the jail Robert and William Christian; that this plan or common design had its first inception in Pottawatomie county, being about forty-five miles from Oklahoma City, and four or five days before the jail delivery, the jail delivery having occurred on Sunday evening, June 30, 1895. The plan was that Reeves and Fessenden were to carry certain pistols or revolvers to Oklahoma City and to deliver the pistols to a gambler in Oklahoma City, and this gambler was to carry or deliver these revolvers to a prostitute, who was to carry them into the jail to be delivered to Robert and William Christian for the purpose of aiding and assisting them in making their escape from said jail. It further appears from the evidence that in furtherance of this common design or purpose, Reeves and Fessenden went to Oklahoma City and delivered certain revolvers to one Jessie Findley and Louie Miller and that said Jessie Findley and Louie Miller carried four pistols into the jail on Monday and Friday preceding the day of the jail delivery, It further appears from the evidence that the defendant Reeves and Fessenden were in the jail on Friday before the jail delivery and had a long conversation, lasting probably an hour or an hour and a half, with Robert Christian and William Christian, and that about a half an

hour thereafter certain revolvers were seen in the posses-sion of Robert Christian and William Christian. It further appears from the evidence that four loaded pistols or re-volvers and ammunition had been placed into the jail, and that a short time before the jail delivery James Casey had in his possession one of these revolvers. The evi-dence further tends to show that James Casey was acting in conjunction with Robert and William Christian, and with the defendant Reeves and Fessenden in procuring his liberation and escape from said jail.

J. C. Dowd, one of the witnesses on behalf of the pros-ecution testified in substance as follows:

"The plan was to get these boys out of jail and to get guns into the jail, you might say, getting them into the jail; they were going to get guns to parties into Okla-homa City and the other parties was to get the guns into jail. * * * These guns were to be carried and turned over to the gambler and the gambler would give them to the whore and the whore would get them into the jail, and then John Reeves and John Fessenden were to stay around town until it came off."

Obe Cox, one of the witnesses on behalf of the prose-cution and who was confined in jail at that time, testified as follows:

"Question. Do you know William Christian? Answer. I do.

"Q. Do you know Robert Christian? A. I do.

"Q. Do you know the defendent, John Reeves here? A. Yes sir.

"Q. State where you were during the month of June, 1895? A. In the Oklahoma county jail.

"Q. Do you know this man, James Casey? A. Yes sir.

"Q. Now please state whether or not you ever saw the defendant, John Reeves, in that jail while the Christian boys and Casey were confined there? A. Yes sir.

"Q. That is, the Oklahoma county jail?  A.  Yes sir.

"Q.  Now please state whether or not you ever saw any pistols in the possession of Robert and William Christian?  A.  I did.

"Q.  Describe those you saw in the jail.  A.  There was two black handled guns—gutta percha handles, blue steel barrels, forty-five Colts; and one white handled gun with an eagle on it—a forty-five.

"Q.  What color was that one with the eagle's head on it?  A.  White handled.

"Q.  Please state when you first saw any of these guns in the jail?  A.  I don't remember the day of the month, but it was on Monday before the jail delivery as near as I can recollect.

"Q.  What day of the week did the jail delivery take place?  A.  Sunday.

"Q.  You saw one there the Monday before that?  A. Yes sir.

"Q.  Do you know who brought the gun in there?  A. Jessie Findlay.

"Q.  Who is Jessie Findley?  A. She is a girl who came there to see Bob.

"Q.  Was any body else with her?  A.  Yes sir.

"Q.  State who.  A.  Mr. Christian was in there while she was in there and Hank Watts at the same time.

"Q.  Hank Watts?  A.  Yes sir.

"Q.  How long did you see this one gun in there before you saw any more?  A.  The Friday following.

"Q.  One the Friday following?  A.  Yes sir, the Friday evening following.

"Q.  What was the description of the gun you saw there on Monday?  A.  Forty-five Colts with gutta-percha handle, blue steel barrel.

"Q.  When did you see this one with the eagle beak on it?  A.  On Friday evening.

"Q. Who had it  A.  Bob Christian.

"Q. At the time the defendant came into the jail there, who came with—when you saw him there the first time? A. John Fessenden.

"Q. Just in your own way say what all those guns were doing there with the Christian boys? A. They came to the door and asked Mr. Garver if they could come in and see the Christian boys; he told them to wait a few minutes, and a short time after that they came inside, and when they came in they commenced tussling with Bob, and we were all locked up in the cage except Bob and Bill and John Fessenden; and John Reeves and Bob and Bill went around behind the cage I suppose for an hour and a half probably, or two hours.

"Q. Was there any guns passed on that occasion? A. There was a steel cage between where I was and where they was, and there was square holes in the cage and I could see some guns but I could not see who was passing them.

"Q. Had you ever seen guns in there before Fessenden and Reeves came in?  A.  No sir.

"Q. Were they there as soon as they went out?  A. About half an hour after they went out  Bill  showed me a gun with a white handle—a gun with an eagle head on it—about half an hour I saw both of them there.

"Q. In order that the jury may understand this, please describe the jail and the location of its cells; what kind of building is that down there?  A.  I don't know the length, I guess it is twice as long as it is wide.

"Q. What kind of material?  A. There is brick and the front cells are of iron and the back cells are steel.

"Q. Were these cages right close to the jail room? A. No sir, there is, I guess, about  six  feet  all  around the cage between that and the wall.

"Q. Now, while Reeves and Fessenden were in there where were the rest of the prisoners; were they in those cells?  A.  They were in the front cells.

"Q. Were they at liberty in there or locked in? A. Locked in the cage.

"Q. Where were the Christian boys? A. On the outside, in this run-around; around the jail inside the brick wall.

"Q. Who put the prisoners in that shape? A. Garver, the jailor.

"Q. Describe to the jury where those steel cages were— where they stand in the jail with reference to the front door at the back end of the jail room. A. The jail fronts to the east, and the front cage— the cage they were in—is next to the door. This steel cage is in the west end of the jail, and they were in the front cage; and they were behind both cages.

"Q. How long were they around there together? A. An hour and a half or two hours; I don't know exactly the length of time.

"Q. Could you hear what they were saying? A. No sir.

"Q. How was their conversation as to being in a low tone or an ordinary tone or a loud tone? A. Talking low.

"Q. It was while you were back there that you saw the guns being handled? A. Yes sir, I was in the front cage and was in the back cell of the front cage.

"Q. How could you see them? Through the bars? A. Yes sir.

"Q. That you say, was on Friday? A. Yes sir.

"Q. What time Friday? A. In the evening.

"Q. Did you see them there any more after they went out that day A. I believe they were back the next day— came back to talk and speak to the boys, but never came in.

"Q. How long did they talk to the boys on Saturday? A. Just a few minutes; I don't remember whether they were there at all on Saturday.

"Q. You say they spoke to the boys? A. Bob and Will.

"Q. Bob and Will, who? A. Christian.

"Q. Now please state whether or not—Did these Christian boys stay there in the jail, how long after that? A. Went out on Sunday evening.

"Q. Describe the manner in which they got out? A. We were all out in the corridor next to the outside there, and the jailor told us to get inside and Jim Casey didn't go in; and they all went in; I wasn't inside either; and they all went in except Jim Casey and I; and Bill pulled the door of the cage to; and Garver opened the outside door and stepped into the corridor to lock the cage and as he went to lock the cage Bill pushed the door open and grabbed the jailor.

"Q. State whether or not these Christian boys had any arms on when they grabbed the jailor? A. They did.

"Q. What did they have? A. A six-shooter apiece.

"Q. Did anybody else have any arms? A. Yes sir. I had a gun and Jim Casey had a gun.

"Q. Four of you had a gun? A. Yes sir.

"Q. State what else was done after the jailor was grabbed? A. Jim Casey ran out of the door, and Mrs. Garver stepped up to the door and hollered, and Jim Casey throwed his gun up on her and told her to get back.

"Q. That was Jim Casey? A. Yes, Bob and Will throwed Garver back up in the corner, and both went out of the door and Bob closed the door after him.

"Q. Did you hear any shooting after they went out? A. Yes sir, a very few minutes after they went out.

"Q. Much or little. A. Sounded like twelve or fifteen shots were fired; we could not tell.

"Q. Can you tell the jury where those guns were kept from the time they came in there on that Friday up to that Sunday evening? A. In the stove pipe—in the damper. There was two stoves in the jail. It was in the back stove. They unjointed the back pipe above the damper, and taken a piece

of blanket and pushed it down on the damper and laid the guns on the top of it and replaced the pipe.

"Q. Did you see those guns gotten out of there immediately before they went out? A. I did.

"Q. What did the boys do with them on that Sunday evening, preparatory to going out? A. Why, they put on spurs. They were all in the corridor, Bob Christian and William Christian. Mackey and myself went around the cages to see and while we were about it Jim got up and unjointed the stove pipe, and Bob taken the one with the white handle with the eagle head on it and Jim took the black handled gun and I took the other.

"Q. They each took one? A. Yes sir.

"Q. Please state what conversation you had with the boys in the jail as to the use that would be made of these guns and what they were going to do with them? A. They said they were going out.

"Q. Who got Casey to go? A. He wanted to go.

"Q. Where was that arrangement made? A. In the jail.

"Q. Do you know that arrangement was made before Fessenden and Reeves came there? A. Yes sir, he allowed to go all the time.

"Q. Please state whether this matter was all arranged before Fessenden and Reeves came there? A. They were.

"Q. I will ask you, what if anything did they say or had been saying about the guns coming in and how they were to get there. A. Well, they said their old guns were coming, some parties below were going to bring them up there.

"Q. Did you know these parties? A. I didn't at the time.

"Q. Did they mention them in the jail there? A. They did afterwards.

"Q. State whether or not you saw any ammunition in the jail there. A. Yes sir.

"Q. How were these pistols as to being loaded or empty? A. They were all loaded."

C. H. DeFord, who was sheriff of Oklahoma county at that time on direct examination on behalf of the prosecution testified as follows:

"Question. Mr. DeFord please state whether or not you ever had any conversation with the defendant with relation to any subject matter of his being present at Mr. Ransberger's in the "Pot" country? On this occasion spoken of by the witness? Answer. I have.

"Q. Tell the jury, what he told you about that transaction? A. He told me he was at Ransberger's and he came over to Oklahoma City in company with John Fessenden.

"Q. What else, if anything, did he say on that subject? A. He told me that he left his revolver in a saloon in Oklahoma City and that John Fessenden had the guns and that John Fessenden delivered the guns to Louie Miller, and he was with Louie Miller and Fessenden at the jail, and Louie Miller put the guns in the jail."

On cross-examination Mr. DeFord testified that the defendant Reeves told him that he Reeves, Fessenden and Miller went to the jail together, and Fessenden delivered the guns to Louie Miller and the jailor stepped out, and Miller put the guns through the front door.

It further appears from the evidence that as soon as the prisoners Robert Christian, William Christian and James Casey had broken out of the jail and in their immediate flight therefrom, the prisoners James Casey and William Christian seized a horse and buggy belonging to one White, and while the deceased, Milton Jones, who was then marshal of the city of Oklahoma City, was attempting to arrest and capture the said Casey and the said

William Christian at the crossing of Grand avenue and Broadway street—a distance of about three-hundred feet from the jail—Jones was shot and instantly killed by the said Casey.

It will thus be seen from the evidence that the defendant John Reeves carried or placed or aided and assisted in carrying or placing into the said jail and in the possession of the said Robert and William Christian and James Casey, certain revolvers or pistols and ammunition, with the design and intent that they should be used or employed as a means and for the purpose of breaking out of the said jail, and effecting their escape therefrom. And we think that the evidence clearly shows that William Christian, Robert Christian and James Casey, in further-ance of said common design and purpose acted conjointly and together with the said defendant John Reeves. It is true that the record shows that the original purpose and design of Reeves and Fessenden was to only liberate from jail Robert and William Christian, and when the plan was first entered into in Pottawatomie county, four or five days before the jail delivery, nothing was said in regard to the escape of Casey. But, we think we are war-ranted in finding from the evidence that before the scheme or plan was finally consummated Casey had full knowledge of the common purpose and design, and was acting in conjunction with the defendant Reeves, and Robert and William Christian. There was no evidence offered on behalf of the defendant.

Under the provisions of our criminal code, all distinc-tion between accessory before the fact and a principal, and between principals in the first and second degree in the cases of felony are abolished, and all persons con-

cerned in the commission of a felony, whether they directly commit the act constituting the offenses or aid and abet in its commission, though not present, must be indicated, tried and punished as principals. (*Drury v. Territory of Oklahoma*, 9 Okla. 398.)

Section 1979 of our criminal code provides:

"That every person who wilfully or by any means whatever, assists any prisoner confined in any prison to escape therefrom, is punishable as follows:

"First. If such prisoner was confined upon any charge conviction of felony, by imprisonment in the territorial prison not exceeding ten years.

"Second. If such prisoners was confined otherwise than upon a charge or conviction of felony, by imprisonment in the county jail not exceeding one year, or by fine not exceeding five hundred dollars, or both."

Section 1980 reads as follows:

"Every person who carries or sends into any prison anything useful to aid any prisoner in making his escape, with intent thereby to facilitate the escape of any prisoner confined therein is punishable as follows:

"First. If such prisoners was confined upon any charge or conviction of felony, by imprisonment in the Territorial prison not exceeding ten years.

"Second. If such prisoner was confined otherwise than upon a charge or conviction of felony, by imprisonment in the county jail not exceeding one year, or by a fine of five hundred dollars, or both."

It will thus be seen that it was a felony for John Reeves to aid and assist the Christian brothers and James Casey to escape from the said jail. It was also a felony for Reeves to carry or send into the said jail any pistols or revolvers for the purpose of aiding or assisting the Christian brothers and James Casey, who were confined in said jail, in making their escape.

Section 2078, of the criminal code is as follows:

"Homicide is murder in the following cases:

"First. When perpetrated without authority of law, and with a premeditated design to effect the death of the person killed, or any other human being.

"Second. When perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual.

"Third. When perpetrated without any design to effect death by a person engaged in the commission of any felony."

In *People v. Brown*, 59 Cal. 352, it was held that,

"Where men confederate together to commit crimes of a nature or under such circumstances as will, when tested by human experience, probably result in the taking of human life, if such necessity should arise to thwart them in the execution of their unlawful plans, it must be presumed that they all understood the consequences which might be reasonably expected to flow from carrying into effect their unlawful combination, and to have assented to the taking of human life if necessary to accomplish the object of the conspiracy."

In *Lamb v. The People*, 96 Ill. 73, the supreme court of Illinois laid down the following doctrine:

"If the unlawful act agreed to be done is dangerous or homicidal in its character, or if its accomplishment will necessarily or probably require the use of force and violence which may result in the taking of life unlawfully, every party to such agreement will be held criminally liable for whatever any of his co-conspirators may do in furtherance of the common design, whether he is present or not."

In *Brennan v. The People*, 15 Ill. 511, it was held:

"Where several persons conspire to commit a felony, and death happens in the prosecution of the common object, all are alike guilty of the homicide; that the act of one is the act of all, although some are not present when the crime is committed.

"The prisoners may be guilty of murder although they neither took part in the killing nor assented to any arrangements having for its object the death of Story. It is sufficient that they combined with those committing the deed to do an unlawful act, such as to beat or rob Story, and that he was killed in the attempt to execute the common purpose. If several persons conspire to do an unlawful act and death happens in the prosecution of the common object, all are alike guilty of the homicide. The act of one of them done in furtherance of the original design is, in consideration of law, the act of all."

The same doctrine is recognized with approval, in *Hanna v. The People*, 86 Ill. 243, where in passing upon one of the instructions given for the people, the court said:

"The instruction given in behalf of the people is not subject to the criticism made upon it. It states correctly that if the defendant and those indicted with him had a common design to do an unlawful act, then in contemplation of law, whatever act one of them did in furtherance of the original design is the act of all, and all are equally guilty of whatever crime was committed."

In *State v. Shelledy*, 8 Ia. 477, it was held that if two or more persons conspire together to do an unlawful act, and in prosecution of the design an individual is killed or death ensue, it is murder in all who enter into or take part in the execution of the design. If the unlawful act be a felony, or be more than a mere trespass, it will be murder in all, although the death may happen collaterally or beside the original design.

In volume six of the American and English Encyclopedia of Law (Second Edition,) pages 870 and 871, the rule is laid down as follows:

"When individuals associate themselves in an unlawful enterprise any act done in pursuance of the conspiracy by one of the conspirators is in legal contemplation, the act of all.

"And this mutual co-equal responsibility of each conspirator for the acts of his associates, done pursuant to and in furtherance of the common design, extends, as well, to such results as are the natural or probable consequences of such acts, even though such consequences were not specifically intended as part of the original plan."

It is next contended that the court erred in giving the following instruction to the jury:

"You are further instructed that if you believe from the evidence in this case beyond a reasonable doubt, that on and prior to the said 30th day of June, 1895, William Christian, Robert Christian and James Casey named in this indictment were confined as prisoners in the common jail and prison of and in the county of Oklahoma and Territory of Oklahoma, the said William and Robert Christian upon an order and commitment upon and after the conviction of the crime of manslaughter, and the said James Casey upon a commitment and indictment charging him the said James Casey with the crime of murder then the said William Christian, Robert Christian and James Casey were lawfully imprisoned in said county jail and prison; and if you find from the evidence beyond a reasonable doubt that the defendant herein, John Reeves, did carry or place or cause to be carried or placed or in any manner aid or assist in carrying or placing in said jail and in the possession of the said William Christian, Robert Christian and James Casey, and pistols, revolvers and ammunition with the design and intent that

they the said William Christian, Robert Christian or James Casey, or either of them, should use or employ such pistols, revolvers, ammunition or any of them, as a means and for the purpose of breaking out of said jail and prison and escaping therefrom; and if you further believe from the evidence beyond a reasonable doubt that the said William Christian, Robert Christian and James Casey acting conjointly and together and with a common purpose to secure the liberty from such imprisonment of each of said' prisoners, did break out of said jail and attempt to escape therefrom, and that the said William Christian, Robert Christian and James Casey, or either of them, in breaking out of said jail, or in their immediate flight therefrom in escaping therefrom, did with said pistols and revolvers or any of them, shoot and kill the deceased Milton Jones, in manner and form as charged in this indictment, and in furtherance of their said design and purpose to escape from such imprisonment, then you will find the defendant John Reeves guilty of murder, as charged in the third count of this indictment, although the jury may believe from the evidence that the fatal shot which killed him the said Milton Jones was not fired and discharged with premeditated design to effect the death of him the said Milton Jones."

We think that this instruction correctly states the law, and no error was committed in giving it to the jury. We have also examined all the instructions offered by the defendant and refused by the court, and we are of the opinion that they were properly refused. The instructions as a whole which were given by the court, in our judgment, clearly, fully, fairly and correctly state the law.

Error is also assigned on the ground that the court erred in admitting certain incompetent evidence offered on behalf of the prosecution over the objections of the defendant. We have examined each of these assignments

of error, and we are clearly of the opinion that they are not well taken. We have examined with great care the entire record, and considered each of the thirty-one errors assigned by counsel for plaintiff in error and in our opinion no prejudicial error was committed by the trial court.

The judgment of the district court of Canadian county is therefore affirmed.

All of the Justices concurring.