Fuchsberg, J.
(concurring in result). I too vote to reverse, but, doing so, would hold that (1) that the Appellate Division was correct in holding that the unobjected to error in the charge on the burden of proof on intent presented a reviewable question of law and (2), that, in the context of this case, the error was harmless.
I
Turning first to the reviewability issue, I respectfully suggest that it is unfortunate in the extreme that the court takes this occasion to cut back on the hard won exemptions by which we have softened the rigors of the preservation doctrine when applied to certain fundamental constitutional rights (see, e.g., People v Michael, 48 NY2d 1 [double jeopardy]; People v Ermo, 47 NY2d 863 [right to counsel]; People v Patterson, 39 NY2d 288, affd 432 US 197 [burden of proof]; People v McLucas, 15 NY2d 167 [comment on defendant’s failure to take stand]).
The majority opinion, recognizing that, in Patterson, the absence of a timely objection did not deter us from reviewing the contention that there had been an unconstitutional shift of the burden of proof, now seeks to distinguish that case from the present one by resort to the rationale that Patterson’s "failure to object was excusable because the statutory practice had previously been deemed valid and only been called into question by an intervening Supreme Court decision” (at p 472), while Sandstrom v Montana (442 US 510), the decision substantively governing the present case, did not enunciate any new rule of law. To support this thesis, it goes on to cite several opinions of this court disapproving a "natural and probable consequences” charge (e.g., Stokes v People, 53 NY 164, 179).
But our decisional law on that score is hardly so one-sided. However we may differ with it in the opinions we hand down today, the simple fact is that, as this court took the pains to point out in People v Lieberman (3 NY2d 649, 652-653), it is *475 "well established, both here and in sister States, that a person is presumed to intend the natural consequences of his act (Darry v. People, 10 N. Y. 120; Ruloff v. People, 45 N. Y. 213; Foster v. People, 50 N. Y. 598; Lyons v. State, 30 Tex. Cr. Rep. 642; Reeves v. Territory, 10 Okla. 194; Brennan v. People, 15 Ill. 511; Stephens v. State, 42 Ohio State 150; Mitchell v. Commonwealth, 74 Va. 845; 1 Warren on Homicide, p. 233; Wharton on Homicide [3d ed.], § 418; 22 C. J. S., Criminal Law, § 87, p. 155).” An unmistakably apt illustration is Thomas v People (67 NY 218, 225), where in approving a charge that the manner in which a deadly weapon was used furnished "presumptive evidence of an intent * * * to take life”, the court observed, "This portion of the charge was simply upon the fact of killing and the intention to kill. The fact that the prisoner plunged this pointed knife into what he knew to be a vital part of the body must raise a presumption that he intended to take life. Its natural result would be to destroy life, and he must be presumed to have intended the natural consequences of his act just as if he had aimed at the heart of the deceased and fired a gun”. Moreover, such manner of charge was so well accepted that it has never previously been challenged on constitutional grounds in this State (see People v Gray, 71 AD2d 295, 297).*
Against this backdrop, I suggest that it is disingenuous to fault counsel for not anticipating the Sandstrom declarations. In short, there is no less reason to review in this case than there was in Patterson.
II
Now, as to my view that the errors in the charge on intent, concededly one not likely to be chosen as the model for a pattern jury instruction, could not have affected the outcome of the trial and therefor was harmless as a matter of law.
I start with the caveat, not stated here for the first time, that one should not always assume that "from the remote fastness of an appellate court, the pulsebeat of the courtroom *476 can be perceived with sufficient reliability to predict whether, when there has been such error, the result would have been affected. Put another way, an appellate court is too different from a lay jury to permit one to substitute for the other” (People v Crimmins, 38 NY2d 407, 425 [dissenting opn]). That said, it is still true that, since Judges, however they try for perfection, are not immune from trial errors, and since not every error renders a trial unfair, the law’s responsibility may be deemed acquitted when the trial it has provided, though imperfect, is fair (People v Glass, 43 NY2d 283, 286). Moreover, because errors of all degrees may occur at any stage of a trial, their harmfulness cannot be made to depend on such an unswerving absolute as their locus in the constellation of trial events. An error in a charge, taken, as here, in the factual and legal trial context in which it occurs, may or may not be inconsequential; so too, a departure from the rules of evidence may or may not be devastating. In the end, each charge must stand on its own circumstances. (See, generally, Principles for Application of the Harmless Error Standard, 41 U of Chicago L Rev 616.)
Withal, while certain errors, such as denial of the right to counsel, can never be deemed harmless (People v Felder, 47 NY2d 287, 295), others, including ones of Federal constitutional magnitude, are subject to harmless error analysis (People v Almestica, 42 NY2d 222, 226; People v Crimmins, 36 NY2d 230). Specifically, in a string of cases, both this court (e.g., People v Sangamino, 258 NY 85, 88-89; People v Wagner, 248 NY 553; People v Dunbar Contr. Co., 215 NY 416, 424-425 [Cardozo, J.] [also involving an alleged error in charging as to a presumption]; see, also, People v Buchalter, 289 NY 181, 224-230 [Lehman, Ch. J., concurring]) and the United States Supreme Court (Hamling v United States, 418 US 87, 107; cf. Harrington v California, 395 US 250) have held that erroneous jury charges fall within this category.
For, in weighing such an error, we must "form a picture of the whole trial [and] * * * endeavor to see that picture as the jurors saw it” (People v Buchalter, 289 NY 181, 224, supra). Put another way, while there is "no yardstick to measure error and differentiate between the technical and the substantial, an underlying and controlling principle is at hand. If study of the case on appeal persuades the court that the minds of the jurors were clearly ■ directed to the true issue involved, that they were not misled or confused to defendant’s *477 detriment, then the [harmless error] mandate * * * should be followed — even though the appellate judges may disagree with the verdict at which the jury arrived” (People v Mleczko, 298 NY 153, 162).
These are precisely the considerations that, however labeled, in my view are implicit in the companion cases of People v Marr and People v Getch (50 NY2d 456). In contrast to Patterson and Mullaney v Wilbur (421 US 684), where the trial courts expressly and unequivocally and uncompromisingly instructed the juries that the defendants bore the burden of proof on particular issues, our close analysis of what I regard as the comparatively more ambivalent Marr and Getch charges bespeaks a concern with the totality of the circumstances. In this respect, our decisions reflect Sandstrom’s description of similar instructions as creating a "risk” or "possibility” of prejudice, as opposed to a conclusion that such an undesirable result necessarily followed (442 US 510, 514-515, 519). My indorsement of a harmless error approach also finds support in such sources as State v Hock (54 NJ 526, cert den 399 US 930), a decision of the Supreme Court of New Jersey that closely parallels the instant case. It was there held that a charge that the presence of a revolver in an automobile was "presumptive evidence” of possession by an occupant, though unconstitutionally shifting the burden of proof of that element, was not "such grievously prejudicial error” as to compel reversal. The Hock court’s examination of all the circumstances, including the strength of the State’s proof and the effect of the defendant’s own testimony, corroborates the propriety of a harmless error analysis here. (See, also, Hamling v United States, 418 US 87, 108 [erroneous instruction that jury could consider national community standard in obscenity case]; United States v Mikelberg, 517 F2d 246, 253-254, cert den 424 US 909 [element of crime erroneously deemed established as a matter of law rather than submitted to jury as one of fact].)
These principles in mind, any fair resumé of the facts makes clear that, for all practical purposes, the existence of intent here was undisputed and indisputable. When one gets right down to it, all the contest was about was the veracity of defendant’s alibi claim and the voluntariness of his confessions. The objective and undeniable physical facts demonstrate beyond question that, if a directed verdict were ever permissi *478 ble in a criminal prosecution, it would have been justified in this case on the element of intent.
The People’s proof revealed that shortly before the crimes were uncovered Thomas told an acquaintance, Dale Turner, that he was going to "check on” Deborah Williams, who resided in the same tenement house as did Thomas. When defendant later returned to state that he had found Deborah dead, Turner called the police, who discovered Deborah in her blood-splattered apartment, a knife imbedded in her back. There was no sign of forced entry. In an adjoining room, still alive, were her mortally wounded daughters, three-year-old Karen and five-year-old Michele.
The uncontradicted medical testimony was that Karen alone had suffered 25 stab wounds plus multiple skull fractures. Michele had been stabbed nine times and her skull broken in five places. All these stab wounds were apparently caused by a pair of scissors. The mother sustained two skull fractures and 11 stab wounds. The knife with which the latter were inflicted had been driven through her back with sufficient force for it to protrude through her chest. In all, the stab wounds alone numbered 45.
Thomas at first told the police that he and Deborah were "just friends”. During the course of the investigation, however, a different picture developed. Conversations with others revealed that defendant was in love with Deborah, had proposed to her, possessed her photograph and a set of keys to her apartment, and had, at least on occasion, shared her bed. Moreover, he had appeared extremely jealous and, three weeks before her death, had threatened to kill her when he learned she had entertained an old friend. Confronted with these revelations, the defendant, who the record shows was given Miranda warnings, made three confessions in which he admitted that, on the night of her death, he had visited Deborah’s apartment, where, in the course of a quarrel over her relationship with another man, he first struck her manually and then stabbed her in the back and, when she attempted to rise, repeatedly punched and kicked her. In the statements he further recounted how, upon hearing the children crying in their bedroom, he decided to silence them and, finding himself unable to extricate the knife because its handle had broken off while it was being plunged into their mother’s back, he used scissors to despatch them. Explicit too was his blow-by-blow detailing of how he repeatedly turned *479 from victim to victim to use the scissors, his feet and his fists until the carnage was complete.
The defense at trial consisted, in the main, of an alibi and a claim that the confessions were the product of threats of physical harm by the police. The alibi, unsupported by any testimony but that of defendant, was premised on protestations of his fondness for Deborah and her children, on denials that he had ever objected to her sharing her affections with others and on his insistence that, though he had visited her on the fateful evening, he was elsewhere at the hour the People claimed the attacks had taken place. The confessions, of course, were material on motive and the identity of the killer. However, no more than the self-standing, unimpeached and unrebutted physical aftermath of the crimes — caused by the administration of not merely one or two or three, or even 10, but literally dozens of blows and stabbings — was needed to establish beyond debate that, whoever the perpetrator, he could not have lacked the intent to kill.
In this factual framework, the defect in the charge to Elery Thomas’ jury must be found harmless. All the more is this so since the prejudice that might be thought to emanate from its erroneous presumption language is effectively diluted, if not minimized, by the trial court’s further instructions: "Intent is a mental operation that can be proved usually only by facts and circumstances surrounding the acts and events leading up to and following them. * * * The intent mentioned in the law is determined from the facts and all the surrounding circumstances. * * * The whole question of the intent of a witness, its effect on the testimony is for you, the jury, to decide. * * * It is incumbent upon the People before they demand a finding of guilt that they tear away [defendant’s] cloak of innocence by proof of [his] guilt beyond a reasonable doubt. This is a burden which remains upon the People throughout the trial and it never shifts to the defendant. * * * The first element that you must find beyond a reasonable doubt is that the defendant formed the intent to cause the death and, in that, you have a right to consider * * * the nature and the alleged means used, to wit: a knife * * * and also a scissors * * * and all of the other surrounding circumstances, number of wounds, et cetera.” The result was that the likelihood that defendant would suffer prejudice from the ill-chosen phrasing was small indeed. Quite plainly, the issue at trial was the identity of the perpetrator, in comparison to which the ques *480 tion of intent receded far into the background. And, in the context of the quantity of the acts by which the crimes were committed and the quality of the People’s proof, it is almost inconceivable that the residual error confused the jury.
In sum, considered on their merits, the facts which here spelled out an unmistakable intent to kill or, at the very least, a depraved indifference to human life (Penal Law, § 125.25, subds 1, 2) were too overwhelming to avoid the conclusion that the charge’s imperfection was harmless beyond a reasonable doubt (see Chapman v California, 386 US 18; People v Crimmins, 36 NY2d 230, 237-238, supra).
It is for these reasons that, though I concur in the reversal of the order of the Appellate Division, I cannot accept the majority’s rationale for doing so.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones and Meyer concur with Judge Wachtler; Judge Fuchsberg concurs in result in a separate opinion.
Order reversed and case remitted to the Appellate Division, First Department, for further proceedings in accordance with the opinion herein.

 In law, the term "presumption”, though sometimes carelessly employed as a synonym for "inference”, is a most consequential evidentiary concept. In the absence of sufficient rebuttal evidence, a true presumption requires the trier of fact to find that the "presumed fact” exists. It is, of course, to be distinguished from a so-called "conclusive” or "irrebuttable” presumption, which in reality is a substantive rule of law. (See, generally, People v Leyva, 38 NY2d 160, 168 et seq.; 9 Wigmore, Evidence [3d ed], §§ 2490-2492; Richardson, Evidence [10th ed — Prince]#-§§ 55-57.)